UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRANK MAKI <br>          Plaintiff, Pro Se. <br>       Vs. <br> THE TRAVELERS COMPANIES, INC. <br> NORTHLAND INSURANCE COMPANY <br> LOVULLO ASSOCIATES <br> MANG INSURANCE AGENCY <br> WILLIAM HALPIN <br> DAWN VARGA <br> BARBARA FOWLER <br> STEPHANIE TWEEDIE <br> MOLLY JANITZ <br> MELISSA PRISCO <br> MICHELLE MESCHKE, <br>            Defendants. | Civil Case No. <br><br> **3:14 CV8 TJM/DEP** <br><br> CIVIL COMPLAINT <br> PURSUANT TO THE <br> ANTITRUST LAWS OF <br> THE UNITED STATES <br> OF AMERICA. |



U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
JAN 03 2014
AT____ O'CLOCK
Lawrence K. Baerman, Clerk - Binghamton

Plaintiff demands a trial by JURY.

### JURISDICTIONAL ALLEGATIONS

1. Jurisdiction is conferred on this court pursuant to 28 s 1331, Federal question and 28 s 1332, Diversity of Citizenship.

   Venue is based on diversity of citizenship pursuant to 28 s 1391 and 15 USCA s 22.

### PARTIES

2. Plaintiff: Frank D. Maki (hereinafter Frank) 4789 Route 23
   Walton, NY   13856   Tel: (607) 865-7010

3. Defendant: The Travelers Companies, Inc. (hereinafter Travelers) is an insurance holding company incorporated in Minnesota with its principal place of business at 485 Lexington Ave., New York, NY.  It derives substantial revenues and has sufficient contact with New York State from issuing insurance policies therein to support jurisdiction in New York.

4. Defendant: Northland Insurance (hereinafter Northland), 385 Washington St., Saint Paul, MN, 55120, is a wholly owned subsidiary of Travelers, licensed to sell insurance in New York State and a national insurance company.  It derives substantial revenues and has sufficient contact with New York State from issuing insurance policies therein to support jurisdiction in New York.

5. Defendant: LoVullo Associates (hereinafter LoVullo), 6450 Transit Rd., Depew, NY, 14043, is a general insurance broker licensed in the State of New York.

6. Defendant: Mang Insurance Agency (hereinafter Mang), The Metrocenter, 49 Court St., PO Box 5306, Binghamton, NY, 13902, is an insurance company licensed in the State of New York.

7. Defendant: William Halpin (hereinafter Halpin), formerly Northland Ins., One Tower Sq., 4MN, Hartford, CT, was

2

an officer of Northland Insurance with his principal place of business in Hartford, CT.

8. Defendant: Barbara Fowler (hereinafter Fowler), Mang Insurance Agency, 66 S. Broad Street, Norwich, NY, is an officer of Mang with her principal place of business in Norwich, NY.

9. Defendant: Stephanie Tweedie (hereinafter Tweedie), formerly Mang Insurance Agency, Wilber National Bank, Hancock, NY, was an insurance broker for Mang with her principal place of business in Hancock, NY.

10. Defendant: Dawn Varga (hereinafter Varga), LoVullo Associates, 6450 Transit Rd., Depew, NY, 14043, is a Transportation Underwriter for LoVullo with her principal place of business in Depew, NY.

11. Defendant: Molly Janitz (hereinafter Janitz), Mang Insurance Agency, 1 North Main St., PO Box 717, Sherburne, NY, 13460, is an insurance broker and Commercial Lines Representative for Mang with her principal place of business in Sherburne, NY.

12. Defendant: Melissa Prisco (hereinafter Prisco), formerly Mang Insurance Agency, 3 Gardiner Pl., Walton, NY, 13856, residence-Archie Elliot Rd., Delhi, NY, 13753, is a Customer Service Representative for Mang, formerly with her principal place of business in Walton, NY.

13.   Defendant: Michelle Meschke, Esq. (hereinafter Meschke),

Compliance Officer, Assistant Secretary & Counsel,

Northland Legal, 385 Washington St., St. Paul, MN, 55120,

is a supervising official for Northland with her principal

place of business in St. Paul, MN.

14.   This action is brought pursuant to:   United States

Antitrust Laws, the Sherman Act, 15 USCA s 1, 15 USCA s 2,

and 15 USCA 15.

15.   Venue is based on diversity of citizenship pursuant to 28

s 1391 and 15 USCA s 22.


### GENERAL ALLEGATIONS


16.   At the end of July 2008, Frank spoke with Tweedie on the

phone about commercial insurance coverage for his class 8

tractor.

17.   On August 4, 2008, Frank again spoke with Tweedie on the

phone.

18.   On August 4, Tweedie described terms for an insurance

policy which would provide Frank with Bobtail Liability and

Collision Insurance Coverage on his class 8 tractor.   The

amount of collision coverage was $11,000.

19.   An appointment was made for August 7, 2008 to meet,

review the paperwork and make an initial payment.

20. On August 7, 2008 Frank went to the Walton office of Mang on Gardiner Place for the meeting.

21. Upon information and belief, on August 7, Frank met Prisco at the receptionist's desk.

22. Frank asked if Tweedie was available. Prisco said that she was.

23. Immediately, Tweedie appeared and shook Frank's hand.

24. Tweedie did not identify herself.

25. They went into the adjacent office.

26. Tweedie showed Frank an insurance binder for the coverage they had discussed on the phone.

27. Frank read the binder, signed it then gave it back to Tweedie.

28. Frank made out a check for the full amount of the annual premium and gave it to Tweedie.

29. Frank needed an insurance card so that he could drive his truck to Indiana to begin a new lease agreement with CRST Malone.

30. Tweedie said that it would be some time before the full contract was ready, but that Frank could stop in earlier to pick up a New York State Insurance Identification Card, showing proof of insurance, in a few days.

31. Tweedie said that Frank could pick the insurance card up from Janitz.

32.  That reference made Frank assume that the receptionist Prisco was Janitz.

33.  Tweedie said that Mang would need a copy of the full lease agreement and permanent registration.

34.  Frank said that he would drop off copies as soon as he returned from orientation with CRST Malone in Indiana.

35.  Tweedie said that would be fine and that Frank could drop the copies off with Janitz at the Walton office at any time.    That ended the meeting.   The reference to Janitz reinforced Frank's belief that Prisco was Janitz.

36.  On August 12, 2008 Frank received a phone call from someone at Mang saying that his insurance card was ready and he could pick it up.

37.  Frank went to Mang's Walton office and picked up the card from Prisco.

38.  Frank had the mistaken idea that Prisco was Janitz.

39.  Later that day, Frank's truck was ready and he left for orientation with CRST Malone in Indiana.

40.  On August 15, 2008 Frank completed orientation with CRST Malone in Rockport, IN, and completed a lease agreement with it.   After orientation, he also received a permanent plate for the truck and got a copy of the registration. So, Frank began working for CRST Malone over-the-road.

41.  On August 27, 2008 Frank returned to Walton, NY for the
first time since August 12.

42.  On August 28, 2008 Frank made copies of the entire lease
agreement and registration and dropped them off at Mang's
Walton office with Prisco.

43.  Later that day, Frank had a phone message on his
answering machine thanking him for dropping off the
paperwork.

44.  On September 2, 2008 Frank left home and returned to work
over-the-road.

45.  On September 22, 2008, without Frank's knowledge, Mang's
Walton office received a copy of the lease agreement and
registration from Paula Wells of CRST Malone.

46.  Paula Wells sent a total of 17 pages.  Mang received all
17 pages.

47.  Tweedie and Prisco removed 3 pages, pages 5, 6 and 8 from
the lease agreement, and forwarded 14 pages to Mang's
Binghamton office to be forwarded to LoVullo, Northland and
Travelers.

48.  On October 4, 2008 Frank returned to Walton, NY for the
first time since Sept. 2.

49.  In Frank's stack of mail there was a letter from Janitz
dated September 11, 2008.

50.  Janitz's letter was written on Walton office stationary.
It requested a copy of the lease agreement and
registration.

51.  The request for another copy of the lease agreement and
registration confused Frank.

52.  Frank listened to his phone answering machine messages.
One of the messages was from someone at Mang.  It stated
that pages 5, 6 and 8 of the lease agreement were missing
and that Mang needed copies of those pages to complete the
contract for insurance and keep it in force.  This further
confused Frank, but he decided to make copies of pages 5, 6
and 8 and drop them off at Mang's office.  If they needed
more information, he would find out exactly what was needed
when he delivered the 3 copies.

53.  On October 6, 2008, Frank went to the post office, made
copies of pages 5, 6 and 8 of the lease agreement and took
them to Mang's Walton office.

54.  Frank handed the copies to Prisco.

55.  Frank asked Prisco if those copies were what Mang was
looking for.  Prisco said that they were and that there
shouldn't be any more problems with the insurance contract.

56.  On October 14, 2008, Frank left home and returned to work
over-the-road.

57.   On Friday, November 28, 2008, Frank returned to Walton, NY for the first time since Oct. 14.   There was no communication regarding the insurance contract.   There was no letter in the pile of mail and no message on the phone answering machine.   There was no refund of premium.

58.   Frank wanted to take time off from work.   He was tired and aggravated by business conditions.   Profits were hard to assemble while working over-the-road.   To make matters worse, in November, the differential in Frank's truck had needed to be replaced.   It had cost $1,957 to replace it and Frank was short on cash.   He needed to get back to work right away to keep his business thriving.   So, even though he was uncomfortable without a copy of the insurance contract, and it made him anxious and emotionally distressed, he decided, based on his past experiences with insurance contracts issued by Northland Insurance for his truck, that he should return to work as soon as possible to keep from running into financial difficulty.

59.   On Monday, December 1, 2008, Frank left home and returned to work over-the-road.

60.   On December 6, 2008, Frank was in an accident with his truck a short distance south of Knoxville, TN.   The truck was damaged beyond repair.   Frank was seriously injured.

61.  The anxiety and emotional distress caused by the insurance confusion contributed to the mistake Frank made that led to the accident.

62.  On Dec. 6, 2008, Frank was taken to the University of Tennessee Memorial Hospital (UTMH) and treated for the injuries caused by the accident.

63.  On December 11, 2008, Frank was released from UTMH and he returned home.

64.  A day or two after returning home to Walton, NY, Frank phoned Tweedie to report the accident and make a claim for collision insurance proceeds.

65.  The truck was being held at a vehicle towing facility that was charging $50.00/day for storage.

66.  Tweedie told Frank that the insurance policy had been cancelled.

67.  A couple of days after December 15, 2008, Frank received a premium refund check from Mang dated Dec. 15, 2008.

68.  The Mang check had been written after Frank had notified Tweedie of the accident.

69.  Not long after receiving the premium refund check, Frank filed a complaint with the State of New York Insurance Department.  It began an investigation.

70.  On January 2, 2009, Frank sent a letter to Mang's Delhi, NY, office asking why it was issuing a refund check,

reminding it that he had a contract for insurance and
telling it that an appraiser should be sent to the TN
wrecking yard to make an appraisal.   The Delhi office had
been on the refund check envelope as the return address.

71.   In the middle of January 2009, Frank received a letter
dated Jan. 12, 2009, supposedly from Kelly Danielle
Tweedie, on Walton office stationary.   Upon information and
belief, Kelly Danielle Tweedie is actually Stephanie
Tweedie.

72.   The letter stated that the insurance policy had been
cancelled because a page was missing from the lease
agreement copy.

73.   In February 2009, Frank received a phone call from a
Patricia who claimed to work for Mang Insurance Agency and
who needed a copy of the lease agreement to look into the
insurance matter.

74.   On February 11, 2009, Frank faxed an authorization letter
to Patricia so that she could get a copy of the complete
lease agreement from CRST Malone.

75.   A few days later, Frank called the New York State
Department of Motor Vehicles for advice about the truck's
appraisal.   The motor vehicle department representative
told Frank that if he had not received an appraisal on the

11

truck by that time, he could legally get an independent
appraisal himself and rely on it in future actions.

76.   Frank found an 'independent insurance appraiser' near
Knoxville, TN on the internet. He called the office. The
appraiser's secretary told Frank that it could not provide
an appraisal, it only works for insurance companies.

77.   Frank contacted Peterbilt of Knoxville. It agreed to
provide an appraisal.

78.   By February 19, 2009, Frank had still not heard back from
Mang. Frank paid off the balance of the mortgage on the
truck for $2,864, sold the truck to a salvage yard in
Tennessee for $2,000, and paid the storage fees to the
wrecking yard which were $3,332 with tax. Later, he got a
copy of a clear title and sent it to the new owner.

79.   The disposition of Frank's truck ended his trucking
business entirely. He had invested $35,206 in the truck
since he had bought it in 2006 and 659 hours of his own
labor to make the useful life of the truck at least 4 more
years. The book value of the truck was $28,237 after
depreciation and the loss on disposition of the truck was
$29,569 with storage costs. Much of the value was in the
engine and drivetrain and might have been recovered if
Frank could have transported the truck home for later
repair or sale. It would have cost approximately another

12

$2000 to have the truck shipped to Walton, NY.  Frank did not have the money available to pay for the shipping when he sold the truck because he never received the proceeds from the insurance policy.

80.  Because of the injuries caused by the accident, which occurred partly due to the emotional distressed caused by the insurance fraud, Frank became permanently disabled and will never be able to return to full time truck driving.

81.  Frank continued to work with the State of New York Insurance Department to resolve the matter.  He sent it a complaint, but discussed the roles of Tweedie and Janitz. This hindered the investigation because Frank did not yet know that he was mistaken about Prisco's identity.

82.  The State of New York Insurance Dept. received false and misleading affidavits from Fowler, Tweedie and Janitz in June 2009.

83.  In September 2009, based on information forwarded by the State of New York Insurance Dept., Frank figured out that Janitz had not been in the Walton office when he had delivered papers.  He investigated and discovered that the receptionist was probably Prisco.

84.  September 3, 2009, Frank called Prisco's home at approximately 10 a.m..  She was away.

85.  At approximately 11 a.m. on Sept. 3, Prisco called Frank
     at his home.  Frank asked Prisco if she had the copy of the
     lease he had dropped off in August 2008.  Prisco admitted
     she had worked in the Walton office around that time, but
     she was unsure if Frank had dropped off paperwork.  She
     said she would check and call again in the afternoon.  She
     did not call again that day.

86.  September 4, 2009, Frank called Prisco's home again and
     got an answering machine.  Frank left a message for Prisco
     asking about the lease copy and asking her to return his
     call.  She never returned the call.

87.  In November 2009, Mang issued another refund check which
     Frank did not accept.

88.  In December 2009, Frank figured out that the defendants
     were likely conspiring in a group boycott based on new
     information he had received from the State of New York
     Insurance Dept..  He tried to get the State of New York
     Insurance Dept. to discipline the defendants.

89.  In January 2010, the State of New York Insurance Dept.
     referred Frank to Christopher Weldon, Esq. (hereinafter
     Weldon) who began representation of Mang.  The State of New
     York Insurance Dept. stated that they recommended the
     agency (Mang) reach out to resolve the matter.

90.  Frank was unable to negotiate a settlement with Weldon.

14

91.   On March 26, 2010, Meschke sent Frank a letter which

stated that she had contacted Weldon.  She also stated that

Northland had properly cancelled the insurance contract.

92.   Meschke did not make any reference to the evidence of a

group boycott.  This solidified the fact of a vertical

group boycott operating to discriminate against Frank.

## COUNT ONE - BREACH OF CONTRACT

93.   Frank realleges all of the allegations in the complaint.

94.   There was no reason to cancel the insurance contract.

Frank had delivered the required paperwork on Aug. 27 to

Mang's, Walton office.  The papers Frank delivered were

disposed of by Mang personnel.

95.   The Notice of Cancellation from Northland Insurance was

mailed on Sept. 18, 2008 and had an Effective Date of

Notice of October 11, 2008.  It did not include a valid

reason for cancellation or a notice that Frank must contact

the New York State Insurance Dept. to contest cancellation.

96.   On September 22, 2008, Mang received 17 requested fax

pages from Paula Wells of CRST Malone that contained the

information Mang had requested.

97.   However, on September 22, 2008, Mang's Walton office

forwarded only 14 pages of the 17 received from Paula Wells

15

to the Binghamton office for LoVullo, Northland and Travelers.  Mang personnel had removed pages 5, 6 and 8 of the lease agreement before forwarding Well's transmission.

98.  That prevented fulfillment of the contingency required to maintain the insurance.

99.  Mang, LoVullo, Northland and Travelers each had evidence of the removal of the three pages from the Wells transmission.  Their failure to honestly supervise the transaction was a breach of contract, and Meschke's failure to acknowledge removal of the three pages by Mang personnel in 2010 completed the objective of the group boycott.

100. On Oct. 6, 2008, Frank delivered copies of pages 5,6 and 8 of the lease agreement to Mang's Walton office.

101. Mang personnel disposed of the copies Frank delivered on Oct. 6.

102. Mang's duty was to operate in good faith to formalize the contract.

103. Mang's disposal of the full contract and lease agreement after Aug. 27, its' disposal of pages 5, 6 and 8 from the transmission sent by Wells, and the disposal of pages 5, 6 and 8 delivered by Frank on Oct. 6 are all breaches of contract.

104. Additionally, although the formalization was supposedly not completed, it is not a valid reason for a policy

cancellation.   The defendants' use of this excuse was a

pretext for discrimination.

105. Although, legally Frank had a valid contract for

insurance, the defendants breached the contract by refusing

to honor it and by trying to get Frank to accept a refund

of premium.   Meanwhile, the damages kept accumulating on

the truck from the storage fees until it was impossible for

Frank to recover it.

106. Frank has stated a cause of action for breach of contract

against the defendants.


### COUNT TWO - FRAUD


107. Frank realleges all of the allegations in the complaint.

108. The defendants, through their places of business,

intentionally made the representation that they would

contract with Frank for insurance coverage in good faith

while planning to discriminate against him.   This was a

material misrepresentation as is evidenced by the

intentional acts they committed and used as justification

to deny Frank's insurance coverage.   They deceived Frank

into believing that they were operating honestly, then,

they destroyed documents and maintained misleading records

in order to deceive authorities.   There was no reason for

Frank to believe from the start that he would be defrauded. The agents were licensed by the State of New York and were selling a product he had previously bought without incident.

109. Tweedie intentionally deceived Frank about the identity of the receptionist in the Walton office by referring to Prisco as Janitz.

110. Tweedie was aware that Janitz would later send Frank a letter on Walton office stationary which would reinforce the identity deception.

111. In Janitz's affidavit to the New York State Insurance Department, she states that she has never worked out of the Walton office.

112. Tweedie tried to confuse Frank about her own identity. In her affidavit to the New York State Insurance Department, Tweedie omitted any discussion of the August 7 meeting in the Walton office knowing that she had not stated who she was on August 7 to Frank.

113. Additionally, in her affidavit to the State of New York Insurance Dept., Tweedie suppressed the fact that Frank was mistaken about Janitz's identity and that Prisco had actually been the receptionist. She did this by failing to discuss the August 7 meeting. Tweedie did not mention Prisco in order to obstruct the investigation, Prisco was

·not asked to submit an affidavit to the State of New York
Insurance Dept..

114. Prisco conspired with Tweedie in the identity deceptions
by not volunteering her own name, knowing in advance that
Janitz would be sending a letter on Walton office
stationary and that Tweedie could respond to a State of New
York Insurance Dept. inquiry by getting an affidavit from
Janitz while suppressing knowledge of Prisco's involvement.

115. This identity deception was planned ahead of time to
later confuse Frank about the identity of the person who
destroyed the documents he delivered.

116. Janitz conspired with Tweedie in the identity deceptions
by issuing a letter to Frank on Walton office stationary.
In Janitz's affidavit to the New York State Insurance
Department, she states that she has never worked out of the
Walton, NY office.

117. Tweedie and Prisco intentionally destroyed all of the
copies Frank submitted to formalize the contract.  They
destroyed the full copy of the lease agreement and
registration copy delivered on August 28, 2008 and they
destroyed the copies of pages 5, 6 and 8 that Frank
delivered on October 6, 2008.  In September 2008, Tweedie
and Prisco received a copy of the lease agreement and
registration from Paula Wells of CRST Malone.  Tweedie and

19

Prisco then destroyed pages 5, 6 and 8 of the lease agreement – pages containing provisions for insurance coverage – and forwarded the incomplete document to Mang's Binghamton office for LoVullo, Northland and Travelers. They did this intentionally to make it appear that they could not formalize the contract.

118. Fowler, in a May 2009 letter to the State of New York Insurance Department, falsely claimed that Mang did not receive a complete lease agreement copy.

119. Fowler had a copy of the lease agreement faxed to Mang by Paula Wells.

120. Fowler knew from the copy of the lease agreement that Tweedie and Prisco had destroyed 3 pages from the transmission.

121. Fowler knew that she was making false statements to the State of New York Insurance Department in her May 2009 letter.

122. LoVullo aided and abetted the fraud.  LoVullo knew, based on the copy of the Wells transmission, that Mang employees were responsible for the missing pages.

123. However, LoVullo supported the wrongful cancellation of the policy and kept silent about the guilt of the Mang employees.

124. Northland aided and abetted the fraud.

20

125. Northland knew, based on the Wells transmission, that Mang employees were responsible for the missing pages.

126. However, Northland supported the fraud and kept silent about the guilt of the Mang employees.

127. Halpin represented Northland to the State of New York Insurance Dept. and is guilty of fraud.

128. Halpin knew from the Wells transmission that the Mang employees were responsible for the missing pages.

129. However, Halpin aided and abetted the fraud by sending a letter on January 14, 2009 to the New York State Insurance Department, in which he omits any discussion of the Wells transmission to keep silent about the guilt of the Mang employees. He knew at that time that the evidence of the Wells transmission had not been given to the State of New York Insurance Dept., so his intentional oversight would not be detected.

130. In March 2010, Meschke knew from contact with Weldon that the State of New York Insurance Dept. had finally gotten a copy of the Wells transmission from Mang. Based on that, she knew that Frank would have a copy. Still, knowing the conclusive evidence of guilt was available to Frank, she wrote a letter in which she suppressed the conclusive evidence and made false statements to support the cancellation.

21

131. Travelers knew from the Wells transmission that the Mang employees were responsible for the missing pages.

132. However, Travelers aided and abetted the fraud by failing to oversee and correct its operations.

133. The fraud prevented Frank from replacing the sham insurance coverage with a policy from an honest insurer and made him live with the emotional distress caused by the confusion the defendants intentionally caused him. This directly contributed to his accident and subsequent damages.

134. Frank has stated a cause of action for fraud against the defendants.

COUNT THREE – GROUP BOYCOTT IN VIOLATION OF THE SHERMAN ANTITRUST ACT, 15 s 1.

135. Frank realleges all of the allegations in the complaint.

136. The defendants conspired to operate a vertical group boycott in order to discriminate against Frank and restrain trade in insurance.

137. The contract for insurance had been paid for and formalized. However, the employees of Mang destroyed documents based on a plan to falsely claim that the

insurance contract had been cancelled in the event Frank
had an accident and needed to collect under the contract.

138. LoVullo, Northland and Travelers aided and abetted the
fraud by ignoring the evidence of wrongdoing by the Mang
employees, knowing they would be wrongly denying payment on
the contract.

139. This made a chain of deceit that operated at each stage
of consideration from the retail producers of Mang all the
way to the top of the hierarchy, the holding company,
Travelers Insurance.

140. In November 2008, although Frank had not received a copy
of the insurance contract, he had been assured by Prisco in
October, when he delivered pages 5, 6 and 8 of the
insurance contract, that there would be no more problems
with the insurance coverage.  And, although it caused him
anxiety and emotional distress not to have a copy of the
contract, he had been covered by Northland Insurance
several times before, he had a copy of his previous
insurance contract with Northland, and he had paid the
premium in full which had not been returned, so legally, he
had no reason to believe he did not have insurance
coverage.  The legal conclusion that he was covered and the
fact that he did not have a refund to purchase insurance
elsewhere restrained him from trading for other insurance.

141.  The restraint of trade is illegal.

142.  Meschke was the last person with supervisory capacity
     who could have corrected the fraud and avoided completion
     of the vertical boycott.  However, in March 2010, Meschke
     joined in the boycott.

143.  Frank has stated a cause of action against the defendants
     for operating an illegal group boycott in violation of the
     Sherman Antitrust Act.

COUNT FOUR – ATTEMPTED MONOPOLIZATION OF THE INSURANCE TRADE
IN VIOLATION OF THE SHERMAN ANTITRUST ACT, 15 s 2.

144.  Frank realleges all of the allegations in the complaint.

145.  Travelers and Northland were operating to monopolize
     commercial truck insurance.

146.  Northland has a virtual monopoly on the type of
     commercial truck insurance purchased by Frank.  Therefore,
     Travelers and Northland know that if a truck is disabled
     and will no longer be used in the trucking industry, the
     insurance policy for the truck will be cancelled; however,
     because of Northland's near monopoly position, Travelers
     and Northland know that the truck that is added to cover
     the loads carried by the disabled truck will, most
     probably, be insured by Northland.

147. This monopoly power makes it easy to implement a policy that will improve Travelers' and Northland's profitability. The insurers simply have to discriminate against inexpensive trucks with small insurance premiums and work to get them replaced by newer trucks with substantially higher insurance premiums.

148. In the present case, the insurers knew that Frank's truck was insured for a value far below the average value of the trucks the insurers provide coverage for. That made Frank a target for discrimination.

149. Frank's truck was insured for $11,000. A new truck in 2008 cost over $100,000 and most were insured for replacement value. So, if Frank's truck is replaced by a new truck, the insurance premium on the new truck will be several times as much as the premium Frank was paying.

150. Additionally, insurance for an owner-operator is not available unless the owner has considerable trucking experience. Travelers and Northland knew that if an experienced trucker such as Frank was disabled, there was a high probability that the work load would be picked up by an inexperienced driver. Inexperienced drivers are insured at much higher rates than experienced drivers.

151. Travelers and Northland supported a policy whereby Frank was deceived about the insurance coverage so that, in the

event no claim was made during the covered period,
Travelers and Northland would still receive the insurance
premium.  They would receive the premium because Frank was
deceived into believing they would honor the insurance
contract, and therefore, he would not try to change
insurance coverage.

152. This allowed Travelers and Northland to maintain an image
of honest dealing while preventing competition in insurance
coverage.

153. In fact, they were exercising monopoly power to maximize
monopoly profits from the insurance industry by
discriminating against low premium payment trucks in favor
of higher premium payment trucks.

154. Frank has stated a cause of action for attempted
monopolization by the defendants in violation of the
Sherman Antitrust Act, 15 s 2.

PRAYER FOR RELIEF

155. WHEREFORE, a jury should establish the culpability of the
defendants as a percentage of the emotional distress that
caused Frank to make a mistake and have a driving accident.
This percentage should then be applied to Frank's realized
and future medical expenses and loss of earnings – these

are business losses as Frank will no longer be able to employ himself as a truck driver.  In addition, the net realized loss on the truck, including the value of the collision insurance coverage, less the cost of trailering the truck back to Frank's residence, and adjusted for reasonable storage costs as if the policy had been timely honored, should be added to the total and then the total should be trebled in accordance with the Sherman Antitrust Act.

156. In the alternative, the net realized loss on the truck, including the value of the collision insurance coverage, less the cost of transporting it back to Frank's residence, and adjusted for the reasonable storage costs as if the policy had been timely honored, should be trebled in accordance with the Sherman Antitrust Act.

| | | |
|---|---|---|
| Book Value of Truck after depr. | | 28,237 |
| Collision Insurance | | 11,000 |
| Storage Costs: | | |
| Actual | 3,332 | |
| Reasonable (2 wks) | 700 | |
| Reimbursement for overpayment | | |
| of storage | | 2,632 |
| Less: Amount received on sale | | (2,000) |
| Less: Cost of transportation | | (2,000) |

Equivalent equity that would

have been realized if the

insurance policy had been

honored                                        37,869


Equivalent equity position trebled for antitrust

violations:

37,869 x 3 = $113,607


157. Or, such other and further relief as the court deems

justified.


Dated: January 2, 2014

_Frank Maki, appellant pro se_


*State of New York, County of Delaware*

*On this date* __|\|2|14__ *Mr. Frank Maki personally appeared
before me to be the signer of this document and he
acknowledges that he did sign it.   Identity was proven on the
basis of (ID)* __833 580 181   NYDX__
                               Exp: 8|23|15


KIMBERLY BIFARO
Notary Public, State of New York
Delaware county No. 01BI6201718
My Commission Expires __3|8|17__

Kimberly Bifaro
Notary