UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
FRANK MAKI,

     Plaintiff,

v.               3:14-cv-8


THE TRAVELERS COMPANIES, INC.,
NORTHLAND INSURANCE COMPANY,
LoVULLO ASSOCIATES, MANG INSURANCE
AGENCY, WILLIAM HALPIN, DAWN VARGA,
BARBARA FOWLER, STEPHANIE TWEEDIE,
MOLLY JANITZ, MELISSA PRISCO, and
MICHELLE MESCHKE,

      Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
THOMAS J. McAVOY
Senior United States Judge

<u>**DECISION and ORDER**</u>

   Plaintiff commenced the instant action, alleging that Defendants breached an

insurance contract with him, engaged in fraud, and violated federal anti-trust laws.

Presently before the Court are Defendants' motions to dismiss Plaintiff's Amended

Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). <u>See</u> dkts. ## 24, 37.

**I. BACKGROUND**

   Plaintiff commenced this action by filing a Complaint and a motion to proceed *in*

*forma pauperis* on January 3, 2014. <u>See</u> dkts. ## 1-2. Magistrate Judge David E.

Peebles gave the Complaint an initial review pursuant to 28 U.S.C. § 1915(a)(1).

Magistrate Judge Peebles issued a Report and Recommendation on April 3, 2014 that

recommended that the Court dismiss Plaintiff's Complaint for failure to state a claim but

also recommended that Plaintiff be granted leave to file an Amended Complaint. <u>See</u>

dkt. # 4.   The Magistrate Judge recommended that Plaintiff's federal claims be

dismissed, and that the Court decline to exercise jurisdiction over Plaintiff's

supplemental state-law claims.  Id.  The Court adopted the Report-Recommendation,

and Plaintiff filed an Amended Complaint on June 2, 2014.  See dkt. # 7, 6.   After

Plaintiff served Defendants with the Amended Complaint, Defendants William Halpin,

LoVullo Associates, Michelle Meschke, Northland Insurance Company, The Travelers

Companies, Inc., and Dawn Varga filed a motion to dismiss.  See dkt. # 24.

Defendants Barbara Fowler, Molly Janitz, Mang Insurance Agency, Melissa Prisco and

Stephanie Tweedie also filed a motion to dismiss.  See dkt. #37.[1]

Plaintiff's Amended Complaint alleges that Defendants injured him by the way

they handled insurance and insurance claims for his commercial motor vehicle.  See

dkt. # 6.   Plaintiff alleges that at the end of July 2008 he spoke with Defendant

Stephanie Tweedie, an insurance broker for Defendant Mang Insurance Agency,

regarding commercial insurance coverage for his class 8 tractor.  Amended Complaint

("Amended Complt.") at ¶ 18.  On August 4, 2008, Tweedie described to Plaintiff the

terms of a policy that would provide him with bobtail liability and collision insurance

coverage for his tractor.  Id. at ¶ 19.  The collision coverage was $11,000.  Id.  Tweedie

and Plaintiff made an appointment for August 7, 2008 to meet, review paperwork, and

make an initial payment for the insurance.  Id. at ¶ 20.

Plaintiff arrived at the Mang Insurance Office in Walton, New York on August 7,

---

[1]Defendant Northland Insurance Company answered the Amended Complaint, but maintained that all but the contract count should be dismissed for failure to state a claim.  See dkt. # 33.

2008 for the meeting.  Id. at ¶ 21.  When he arrived he met Defendant Melissa Prisco at the receptionist's desk.  Id. at ¶ 22.  Though she did not identify herself, Tweedie soon appeared and shook Plaintiff's hand.  Id. at ¶¶ 23-25.  Tweedie and Plaintiff went into an adjacent office where Tweedie showed Plaintiff an insurance binder.  Id. at ¶¶ 26-27. Plaintiff read and signed the binder and gave it back to Tweedie.  Id.  Id. at ¶ 28.  He then wrote out a check for the entire annual premium and gave it to Tweedie.  Id. at ¶ 29.

Frank required an insurance card because he needed to drive to Indiana to begin a new lease agreement with CRST Malone.  Id. at ¶ 30.  Tweedie informed Plaintiff that "some time" would have to pass before Plaintiff could obtain the full insurance contract. Id. at ¶ 31.  She promised, however, that Plaintiff could stop in a few days and pick up a New York State Insurance Identification Card, which would provide proof of insurance. Id.  Tweedie told Plaintiff he could pick up the card from Defendant Molly Janitz.  Id. at ¶ 32.  Plaintiff assumed that Prisco was Janitz.  Id. at ¶ 33.  Tweedie also told Plaintiff he would need a copy of the lease agreement, and Plaintiff promised to bring in a copy as soon as he returned form his CRST Malone orientation in Indiana.  Id. at ¶¶ 34-35. Tweedie told Plaintiff that he could drop off a copy with Janitz in the Walton office at any time.  Id. at ¶ 36.  This statement reinforced Plaitniff's confusion that Prisco was actually Janitz.  Id.  On August 12, 2008 Frank received a phone call from someone at the Mang Agency informing him that his insurance card was ready for pick up.  Id. at ¶ 37.  Plaintiff returned to the agency and received the card from Prisco, who he still believed was Janitz.  Id. at ¶¶ 38-39.

Plaintiff left for orientation in Indiana later that day.  Id. at ¶ 40.  Plaintiff

3

completed his orientation on August 15, 2008.  Id. at ¶ 41.  He also received a completed lease agreement, a permanent plate for his truck and a copy of the registration.  Id.  Plaintiff began working for CRST Malone as an over-the-road driver. Id. at ¶ 41.  On August 27, 2008, Plaintiff returned to Walton, New York for the first time since August 12.  Id. at ¶ 42.  He made copies of the entire lease agreement and registration and dropped them off with Prisco at the Mang office in Walton.  Id. at ¶ 43. He received a phone message thanking him for dropping off the paperwork later that day.  Id. at ¶ 44.

Plaintiff left home for over-the-road work again on September 2, 2008.  Id. at ¶ 45.  Without Plaintiff's knoweldge, on September 22, 2008, Mang received a copy of the lease agreement and registration form Paula Wells of CRST Malone.  Id. at ¶ 46. Plaintiff alleges that Defendants Tweedie and Prisco then removed pages 5, 6 and 8 from the lease agreement and forwarded the remaining fourteen pages to Mang's office in Binghamton, New York.  Id. at ¶ 47.  The document was to be forwarded on to Defendants LoVullo, Northland and Travelers.  Id.

Plaintiff next returned to Walton, New York on October 4, 2008.  Id. at ¶ 48. Included in his mail was a letter from Defendant Janitz dated September 11, 2008.  Id. at ¶ 49.  The letter, written on Walton office stationary, requested a copy of the lease agreement and registration.  Id. at ¶ 50.  As he had already provided this information, Plaintiff was "confused" by this request.  Id. at ¶ 51.  A phone message from Defendant Mang Insurance Agency informed Plaintiff that three pages were missing from the lease agreement.  Id. at ¶ 52.  Without those pages, the insurance contract would be incomplete and would not be in force.  Id.  Plaintiff, though perplexed by this request,

4

made copies of the missing pages.  Id. at ¶  On October 6, 2008, Plaitniff went to the post office, made copies of those three pages, and took them to Defendant Mang's office in Walton.  Id. at ¶ 53.  He handed Defendant Prisco the copies.  Id. at ¶ 54.  Plaintiff asked her if those were the copies the insurer had requested, and Prisco informed him they were, and that "there shouldn't be any more problems with the insurance contract."  Id. at ¶¶ 54-55.

Plaintiff left Walton for another over-the-road assignment on October 14, 2008.  Id. at ¶ 56.  When he returned home on November 28, 2008 he found no communication regarding the insurance contract and no refund of the premium.  Id. at ¶ 57.  Plaintiff hoped to take time off of work.  Id. at ¶ 58.  He was tired, and business conditions were "aggravating."  Id.  Profits were hard to come by in over-the-road work.  Id.  Moreover, the differential in his truck had to be replaced, which cost him $1,957.  Id.  He was short on cash.  Id.  These tight circumstances meant that Plaintiff needed to get back on the road as soon as possible to "keep his business thriving."  Id. at ¶ 58.  Thus, even though he was "uncomfortable" about driving without a copy of the insurance contract, he concluded "based on his past experiences with insurance contracts issued by Northland Insurance for his truck" that he could get back to work and prevent any financial problems.  Id.

Plaintiff again left home for over-the-road work on December 1, 2008.  Id. at ¶ 59.  On December 6, 2008, he had an accident that damaged his truck beyond repair near Knoxville, Tennessee.  Id. at ¶ 60.  Plaintiff was himself seriously injured.  Id.  Plaintiff alleges that the anxiety and emotional distress created by the insurance situation "contributed to the mistake that [he] made that led to the accident."  Id. at ¶ 61.

5

Plaintiff was taken to the University of Tennessee Memorial Hospital and treated for his injuries.  Id. at ¶ 62.  He was released from the hospital and returned home on December 11, 2008.  Id. at ¶ 63.

On December 12, 2008, Frank called Defendant Tweedie to report the accident and make a claim for the proceeds of his collision policy.  Id. at ¶ 64.  At the time, the truck was held at a vehicle towing facility that charged $50.00 a day for storage.  Id. at ¶ 65.  Defendant Tweedie informed Plaintiff that the insurance policy had been cancelled.  Id. at ¶ 66.  Sometime after December 15, 2008, Plaintiff received a premium refund check from Defendant Mang Insurance Agency.  Id. at ¶ 67.  The check was dated December 15, 2008, after Plaintiff informed Tweedie of his accident  Id. at ¶¶ 67-68.

Shortly after Plaintiff received the refund check, he filed a complaint with the New York State Insurance Department.  Id. at ¶ 69.  The Department began an investigation.  Id.  Plaintiff sent Mang's Delhi, New York office a letter on January 2, 2009.  Id. at ¶ 70.  Plaintiff asked why the Agency had issued a refund check and reminded Mang that a contract for insurance existed which required that an appraiser be sent to the Tennessee wrecking yard for an appraisal.  Id. at ¶ 70.  Plaintiff wrote to Delhi because that was the return address on the premium refund check he received.  Id.

Sometime in the middle of January 2009, Plaintiff received a latter dated January 12, 2009 from Kelly Danielle Tweedie.  Id. at ¶ 71.  The letter was on stationary from Defendant Mang's Walton office.  Id.  Kelly Danielle Tweedie is believed to be Stephanie Tweedie.  Id.  The letter stated that the insurance policy was cancelled because a page was missing from the lease agreement.  Id. at ¶ 72.  In February 2009,

6

Plaintiff received a phone call from a woman named Patricia who claimed to work for Defendant Mang.  Id. at ¶ 73.  She needed a copy of the lease agreement to look into the insurance issue.  Id.  Plaintiff faxed an authorization letter on February 11, 2009 to allow Patricia to obtain a complete copy of the lease agreement with CRST Malone.  Id. at ¶ 74.

Plaintiff called the New York Department of Motor Vehicles a few days later to obtain advice concerning appraisal for the truck.  Id. at ¶ 75.  Plaintiff was informed that he could legally obtain an independent appraisal of the truck and rely on that appraisal in future actions.  Id.  Plaintiff alleges that the DMV representative assured him he could do so.  Id.  Plaintiff called the office of an independent appraiser near Knoxville, Tennessee. id. at ¶ 76.  When the appraiser told Plaintiff he worked only for insurance companies, Plaintiff contacted Peterbilt of Knoxville.  Id. at ¶ 77.  Peterbilt agreed to provide an appraisal.  Id.

Plaintiff had not heard from Defendant Mang by February 19, 2009.  Id. at ¶ 78. He paid off the balance of the "mortgage" on the truck for $2,864, sold the vehicle to a salvage yard for $2,000, and paid the storage fees on the vehicle.  Id. The storage fees amounted to $3,332 with tax.  Id.  Plaintiff also obtained a clear title to the truck and forwarded it to the new owner.  Id.  This sale ended Plaintiff's trucking business entirely. Id. at ¶ 79.  Plaintiff had invested $35,206 in the truck since purchasing it in 2006, in addition to 659 hours of his own labor in improving the truck's condition.  Id. at ¶ 79. The truck had at least four more useful years.  Id.  The book value of the truck was $28,237 after depreciation.  Id.  With storage costs, the loss on disposition of the truck was $29,569.  Id.  If Plaintiff had been able to transport the truck home to Walton, New

7

York, he could have recovered most of the value of the truck, which was in the engine and drive train.  Id.  Such transport would have cost $2,000.  He could not pay for transport because he did not receive the insurance proceeds.  Id.  Plaintiff became permanently disabled as a result of the accident and will never return to truck driving. Id. at ¶ 80.

Plaintiff alleges that he continued to work with the New York State Insurance Department to resolve the matter.  Id. at ¶ 81.  He sent a complaint which discussed the roles of Tweedie and Janitz, not realizing that he had mistaken Janitz for Prisco.  Id. The Insurance Department, Plaintiff alleges, received false and misleading affidavits from Barbara Fowler, Tweedie and Janitz in June 2009.  Id. at ¶ 82.  In September 2009, Plaintiff finally concluded that Prisco, not Janitz, had been at the Mang office when he delivered papers.  Id. at ¶ 83.  Information from the Insurance Department helped him reach this conclusion.  Id.  Plaintiff tried to contact Prisco about the lease he dropped off in 2008, but she did not respond adequately to his inquiries.  Id. at ¶¶ 84-86.

Mang issued Plaintiff another refund check in November 2009.  Id. at ¶ 87. Plaintiff did not accept the check.  Id.  The next month, Plaintiff "figured out that Defendants were likely conspiring in a group boycott based on new information he had recieved from the State of New York Insurance Department."  Id. at ¶ 88.  Plaintiff contacted the Insurance Department, seeking to have the Defendants disciplined.  Id. In January 2010 the Insurance Department referred Plaintiff to the attorney for Defendant Mang, recommending that the Mang resolve the issue.  Id. at ¶ 89.  Plaintiff could not negotiate a settlement with Mang.  Id. at ¶ 90.

8

On March 26, 2010, Plaintiff received a letter from Defendant Michelle Meschke relating that she had been in contact with Mang's attorney.  Id. at ¶ 91.  Meschke also informed Plaintiff that Northland had properly cancelled the insurance contract.  Id. at ¶ 91.  Plaintiff claims that Meschke did not address his evidence of a group boycott, and alleges that "[t]his solidified the fact of a vertical group boycott operating to discriminate against" Plaintiff.  Id. at ¶ 92.

Plaintiff's Amended Complaint contains a detailed description of the ways he alleges that trucking companies and insurers restrict competition.  See id. at 93-125.  Trucking companies, Plaintiff alleges, attempt to use inexperienced drivers to keep wages low.  Id. at ¶ 94.  Companies promote high turnover to avoid paying the higher wages experienced drivers demand.  Id. at ¶ 96.   Companies also contract with owner-operators through programs whereby the trucking companies help to finance truck sales and then "act as intermediaries between truck manufacturers, insurance companies, licensing agencies and drivers."  Id. at ¶ 95.  These two factors, Plaintiff contends, lead to a "cartelization" of the industry because drivers cannot truly operate independently but are instead dependent on the trucking companies as intermediaries.  Id. at ¶ 97.

Plaintiff alleges that insurance companies serve this process of restricting competition and preventing drivers from operating independently.  First, Plaintiff alleges, the insurance industry acts to restrict competition among insurers through mergers and takeovers.  Id. at ¶¶ 101-106.   This process helps companies like Defendant Travelers do away with smaller independent agents and operate from centralized offices in larger cities like Hartford, Connecticut, New York City, and Minneapolis, Minnesota.  Id. at ¶ 107.  Defendant Travelers also lobbies heavily in Congress and uses marketing

9

activities like sponsorship of a PGA golf tournament to facilitate its control of the insurance industry.  Id. at ¶¶ 108-115.  Further, Plaintiff alleges, Travelers favors the interests of large trucking companies over individual owner operators like Plaintiff.  Id. at ¶ 117.

Defendant Travelers allegedly uses particular methods to restrict competition and maximize profits in the trucking industry.  Travelers supports activities that lead to high driver turnover, since such actions "weed out low paying premium drivers and replace them with high paying premium drivers."  Id. at ¶ 118.  Plaintiff alleges that Travelers uses "[t]he DAC system[,] . . . a privately organized system that keeps a report on every commercial truck driver based on incidents and accidents reported to it by companies[,] . . . to pressure companies to fire drivers based on Travers' proprietary incident and accident criteria."  Id. at ¶¶ 119-120.  The DAC system records accidents that are not required to be report to state motor vehicle departments, as well as accidents that are reported.  Id. at ¶ 120.  Travelers, Plaintiff alleges, also adopted a policy of withholding claims settlements from drivers with low policy premiums to boost short-term profits.  Id. at ¶ 121.  This policy also had the benefit for Defendant Travelers of forcing experienced drivers who pay low premiums on their insurance policies out of the industry, to be replaced by less-experienced drivers who pay "much higher premium payments."  Id. at ¶ 122.

Plaintiff alleges that he was the type of driver that the trucking industry and insurers hoped to drive out.  He insured his truck for $11,000, far less than the average over-the-road driver.  Id. at ¶ 123.  Plaintiff had many years of experience, which kept his premium down.  Id. at ¶ 124.  This made him a "target" for discrimination from

Northland and Travelers.  Id.

The Amended Complaint raises four claims.  Count One alleges breach of the insurance contract.  Count Two alleges fraud, manifested in misrepresentations made by the insurers that they would provide him with coverage.  Count Three alleges a group boycott in violation of the Sherman Antitrust Act.  Count Four alleges attempted monopolization of the insurance trade, another violation of the Sherman Act.  After being served with the Amended Complaint moving Defendants filed their motions to dismiss.  The parties have briefed the issue, and the Court has determined to decide the case on the pleadings.

## II.      LEGAL STANDARD

Defendants have filed motions to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  In addressing such motions, the Court must accept "all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."  Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009).  This tenet does not apply to legal conclusions.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Id. (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)).

## III.     ANALYSIS

### A.       Defendants' Motions

All of the Defendants argue that Plaintiff's anti-trust claims are barred by the statute of limitations.  See dkt. ##s 24, 37.   Even if not barred, Defendants argue that Plaintiff has failed to state a claim upon which relief could be granted.  For reasons that will become clear, the Court will address only the statute of limitations argument; neither will the Court address Plaintiff's other claims, which are brought pursuant to New York law.

### i.      Statute of Limitations

Plaintiff brings two counts under the Sherman Anti-Trust Act.  See 15 U.S.C. §§ 1, et seq.  That Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."  15 U.S.C. § 1.  The Act also prohibits "any person to 'monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states.'" Spectrum Sports v. McQuillan, 506 U.S. 447, 448 (1993) (quoting 15 U.S.C. § 2).   Plaintiff alleges two types of anti-trust violations: a group boycott and an attempted monopolization.  "Group boycotts . . . generally consist of agreements by two or more persons not to do business with other individuals, or to do business with them only on specified terms[.]" Balaklaw v. Lovell, 14 F.3d 793, 800 (2d Cir. 1994).   Attempted monopolization requires proof "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, 506 U.S. at 456.

Generally, Plaintiff alleges that anti-competitive behavior caused the cancellation

12

of his insurance contract and a denial of coverage on his claim from the 2008 accident.

In alleging a group boycott, Plaintiff asserts that "defendants made a combination on trust and conspired to make monopoly profits from" Plaintiff's "insurance contract" by limiting his choice in insurance, keeping him "tied to a sham insurance contract" and "prevent[ing] competitors from" selling Plaintiff insurance.  Amended Complt. at ¶ 180.  Once Plaintiff made a coverage claim, "the defendants misused their power to wrongfully deny insurance coverage and fix the value" of the coverage at zero.  Id.  In terms of his second anti-trust claim, Plaintiff alleges that "defendants were attempting to monopolize the class 8, O[ver]-T[he]-R[oad], commercial truck insurance" market "in 2008." Id. at ¶ 236.  Travelers allegedly "worked with the other defendants to cooperatively boycott Frank's insurance claim and make monopoly profits." Id. at ¶ 238.  This was part of a larger scheme to drive out customers who paid lower rates and manipulate the customer base to maximize profits.  Id. at ¶¶ 244-50.  Travelers used its market power in an attempt to drive out other competitors who lacked the ability to discriminate against operators like the Plaintiff.  Id. at ¶¶ 251-55.  This scheme led to a situation where Defendants Traverlers and Northland sold Plaintiff a policy they never intended to honor and which, after his accident, forced Plaintiff out of business.  Id. at ¶ 271.  Though Plaintiff cannot return to work as a truck driver because of his injuries, Defendants' policies had squeezed him out of the market anyway.  Id. at ¶ 274.

Defendants contend that Plaintiff's claims are barred by the applicable statute of limitations.  The Sherman Act provides that "[a]ny action to enforce any cause of action under Section 4, 4A, or 4C [15 U.S.C. § 15, 15a, or 15c] shall be forever barred unless commenced within four years after the cause of action accrued."  15 U.S.C. § 15b.

Section 15 permits "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" to sue for treble damages in the United States District Court.  15 U.S.C. § 15(a).  Section 15a provides for suits by the United States and Section 15c permits an attorney general of a State to bring an action for antitrust violations on behalf of the State.  15 U.S.C. §§ 15a, 15c. Section 15 applies here.  Courts have held that "[a] cause of action for violation of the antitrust laws ordinarily accrues as soon as there is an injury to competition."  Higgins v. New York Stock Exchange, Inc., 942 F.2d 829, 832 (2d Cir. 1991).  "The only exception to the date-of-injury rule is the rare case in which the damages caused by an antitrust injury are so speculative that the court is unwilling to estimate them."  Id.

Plaintiff filed his Complaint on January 3, 2014.  If his injury accrued before January 3, 2010, his anti-trust claims are barred by the statute of limitations.  Plaintiff alleges that his accident occurred on December 6, 2008.  Amended Complt. at ¶ 60. When he returned home on December 12, 2008, he made an insurance claim.  Id. at ¶ 64.  Shortly thereafter, Plaintiff received a refund check for his insurance premium.  Id. at ¶ 67.  The check was written after Plaintiff informed Defendant Mang Insurance Agency of his accident.  Id. at ¶ 68.  By January 12, 2009, Plaintiff had been informed by his insurance agent that his policy had been cancelled and the insurer would provide no coverage.  Id. at ¶¶ 71-72.  Plaintiff disputed the insurer's actions, but "[b]y February 19, 2009," after failing to hear from his insurer, Plaintiff "paid off the balance of the mortgage on the truck for $2,864, sold the truck to a salvage yard in Tennessee for $2,000, and paid the storage fees to the wrecking yard which were $3,332 with tax."  Id. at ¶ 78.  Plaintiff alleges that "[t]he disposition of [Plaintiff's] truck ended his trucking

14

business entirely." Id. at ¶ 79.

The Court finds that Plaintiff alleges an injury as a result of Defendants' refusal to honor the alleged insurance contract.  At the latest, this injury came in February 2009, when Plaintiff determined that Defendants refused to honor the policy and he decided to sell the vehicle for salvage.[2]  February 2009 is more than four years before Plaintiff filed his Complaint, and the statute of limitations had run on the anti-trust claims.  The fact that the claim accrued at that time is also evidenced by Plaintiff's allegations regarding complaints filed with New York State regulators early in 2009. The Court will grant the motion to dismiss on this basis.

Plaintiff, who is proceeding pro se, could conceivably argue that he was the victim of a "continuing violation," contending that Defendants' anti-competitive behavior continues to harm him.  Because of the admitted failure of Plaintiff's business, however, such an argument would be unavailing.  This case is similar to Woodbridge Plastics, Inc. v. Borden, Inc., 473 F.Supp. 218 (S.D.N.Y 1979).  In that case, Plaintiff, a supplier of resins, alleged that Defendant violated the anti-trust laws by intentionally withholding supplies from Plaintiff, citing a lack of material, and then negotiating sales of the same material to Plaintiff's customers.  Id. at 220.  Courts have applied a continuing violation theory to claims under the anti-trust laws, finding that "'each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages

---

[2]Plaintiff's assertion that Defendant's are estopped from raising a limitations claim by their alleged fraud in promising to provide coverage and then refusing to do so is unavailing, as Plaintiff clearly alleges that he was aware of this alleged fraudulent behavior by early 2009.  Even assuming fraud, he was aware of Defendant's conduct or the injury it caused him by that point.

caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.'" Id. at 221 (quoting Korry v. Intern. Tel & Tel. Corp., 444 F.Supp. 1983, 195-96 (S.D.N.Y. 1978)).   In the Woodbridge Plastics case, plaintiff learned that Defendant's anti-competitive behavior had caused it injuries more than four years before filing the complaint.  Id.  This anticompetitive behavior made the end of Plaintiff's business "a Fait accompli long before November 28, 1974," which was four years before they filed their complaint.  Id.  The Court dismissed the case, finding that "'where all damages complained of necessarily result from a pre-limitations act by the defendant, no new cause of action accrues for any subsequent acts . . . because those acts do not injure plaintiff.'" Id. (quoting Imperial Point Colonnades Condominium, Inc. v. Mangurian, 549 F.2d 1029, 1035 (5th Cir. 1977)).

Like the plaintiff in Woodbridge Plastics, the Plaintiff here cannot take advantage of any continuing violation doctrine because he admits that he stopped working as a truck driver after his accident.  Plaintiff does not claim that he left the business because Defendants' anti-competitive policies created a barrier to re-entry.  Instead, he alleges that the injuries he suffered in the accident prevent him from working in that field.  Thus, any injury that Plaintiff suffered as a result of the Defendants' anti-competitive policies were the result of pre-limitations activities, and Plaintiff's anti-trust claim is barred by the four-year statute of limitations.  He suffered no new injuries after his business ended.

### ii.    State-law Claims

Plaintiff's remaining claims are brought under New York law, and were before this Court pursuant to supplemental jurisdiction.  See 28 U.S.C. § 1367(a) (except under enumerated circumstances "in any civil action of which the district courts have

16

original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").  A district court may "decline to exercise supplemental jurisdiction over a claim . . . if . . . (3) the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  In determining whether to continue to exercise jurisdiction under these circumstances, the Court is to "[balance] the traditional 'values of judicial economy, convenience, fairness, and comity[.]'"  Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)).

Here, the Court will decline to exercise jurisdiction over the remaining state-law claims.  In balancing the values of judicial economy, convenience, fairness and comity, the Court finds that the allegations and procedural posture of this matter weigh in favor of declining to hear the supplemental claims.  Judicial economy and convenience favor permitting a state court to weigh the issues raised in Plaintiff's complaint.  The Court has declined to address the merits of Defendants' motions, and has not made any findings on the remaining claims.  No discovery has occurred in this matter, and no extended record was developed in this case.  As such, a state-court filing will not lead to duplicative work or wasted effort on the part of any Court or any litigant.  Fairness permits the Court to decline to exercise jurisdiction as well.  Defendants have not argued that Plaintiff's state-law claims are time-barred, and Plaintiff will be permitted to re-plead them in state court, where they can be adjudicated by a court in that system.  Comity favors dismissal as well.  The questions remaining in this case have to do with

17

New York contract and insurance law, and the interplay of that law with allegations of fraud.  New York law is well-developed in this area, and the Court has issued no opinions addressing those issues; a state-court is better positioned to address those questions.

The Court will therefore decline to exercise supplemental jurisdiction and dismiss Plaintiff's remaining state-law claims without prejudice to Plaintiff raising them in the appropriate forum.

**B.     Plaintiff's request for an order preventing Defendants from asserting that the insurance contract had been cancelled at the time of the accident**

In responding to the motion of Defendants Halpin, LoVullo Associates, Michelle Meschke, Northland Insurance Company, The Travelers Companies, Inc., and Dawn Varga, Plaintiff requests that the Court "issue an order of estoppel to prevent the defendants from continuing to prejudice the action" by asserting that the insurance policy had been canceled at the time of the accident.  The Court has dismissed all the claims in this case, and Plaintiff's motion is moot.

**IV.     CONCLUSION**

For the reasons stated above, the Defendants' motions to dismiss the Amended Complaint, dkts. ## 24, 37, are hereby GRANTED.  The Plaintiff's claims brought pursuant to the Sherman Anti-Trust Act are dismissed with prejudice as barred by the statute of limitations.  The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims.

IT IS SO ORDERED

Dated: May 28, 2015


Thomas J. McAvoy
Senior, U.S. District Judge